UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HARRY S. PRICE,

        Plaintiff,

vs.                             Case No.  3:09-cv-1165-J-MCR

THE UNITED STATES OF AMERICA,

        Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action for damages under the Federal Torts Claim Act came before the Court for a bench trial on June 21, 22, and 25, 2012.  After reviewing the parties' proposed findings of fact and conclusions of law, the Court is now prepared to decide the case.

### I. Background

Plaintiff, Harry Price, brought this action pursuant to the Federal Torts Claim Act alleging he received inadequate treatment for a fungal lung infection at the VA Hospital in Gainesville, Florida.  Plaintiff argues the medical personnel at the VA Hospital failed to timely diagnose and treat a fungal lung infection and that the delay in treatment contributed to permanent damage to his lungs.  Defendant, the United States of America, claims the team of professionals treating Plaintiff at the VA Hospital did not breach the standard of care.  Alternatively, Defendant argues that even if the standard of care was breached, Plaintiff failed to show the delay in receiving the anti-fungal medication was the cause of the damage to his lungs.

-1-

On June 9, 2011, the parties consented to have the undersigned conduct the trial of the case.  (Doc. 18).  The case was set for a bench trial on January 24, 2012 (Doc. 36), however, on January 10, 2012, the parties filed a joint motion to continue the trial in order to permit Plaintiff to pursue a claim for benefits with the Department of Veterans Affairs.[1]  (Docs. 47 and 48).   After the Department of Veteran's Affairs denied Plaintiff's claim, the case proceeded to trial on June 21, 22, and 25, 2012.  (Docs. 51 and 54).

## II.  Findings of Fact

Plaintiff, a veteran of the United States Coast Guard, received medical care through the Department of Veteran's Affairs.  He was diagnosed with rheumatoid arthritis in 2006.  On March 7, 2007, Plaintiff, who was sixty-four at the time, presented for a routine appointment with his rheumatologist, Dr. Nicole Robinson, at the VA Outpatient Clinic in Daytona Beach, Florida.  (Tr. 1, 156:11-14).[2]  Plaintiff complained of shortness of breath, weakness, and a non-productive cough for the past seven to ten days.  (Tr. 1, 157:3-6).  Additionally, Plaintiff indicated he had a fever the previous evening.  (Tr. 1, 157:8-9).  Dr. Robinson listened to Plaintiff's chest and noticed "crackles" in the base of his lungs, more pronounced on the left than the right.  (Tr. 1, 158:3-11).  Dr. Robinson then ordered a chest x-ray, which indicated bilateral infiltrates and was consistent with pneumonia.  (Tr. 1, 159:4-7).  As Plaintiff was taking

---

[1] Counsel for Plaintiff explained that the decision to reopen the VA disability claim was due to Defendant's expert's opinion in the instant case that Plaintiff's lung condition was caused by asbestos exposure.  (Doc. 83, p.7).

[2] References to the transcript of the trial will be "Tr., Volume number, Page number : Line number(s)."  The transcript from day one of the trial, June 21, 2012 (Doc. 75), will be Volume 1; day two, June 22, 2012 (Doc. 76), will be Volume 2; and day three, June 25, 2012 (Doc. 73), will be Volume 3.

medications for his rheumatoid arthritis, which suppressed his immunity, Dr. Robinson

was concerned about Plaintiff having an upper respiratory tract infection/pneumonia or

methotrexate lung.  (Tr. 1, 159:21-25, 160:1-9).  Dr. Robinson directed Plaintiff to stop

taking the  immunosuppressive medications and to go to the emergency department at

the VA hospital in Gainesville.  (VA_1291-92).[3]

Plaintiff presented to the emergency department at the VA hospital and was first

evaluated by Dale Syfert, M.D.  Dr. Syfert took Plaintiff's vital signs: his blood pressure

was 123/72, his pulse was 107, his respiratory rate was 20, his temperature was 99.3,

and his oxygen saturation rate was 96% on room air.  (VA_1274, 1277).  Dr. Syfert

ordered blood cultures, sputum cultures, and antibiotics, and requested that the

inpatient team evaluate Plaintiff for admission.  (VA_1276).  According to the records,

cultures were taken at 20:20 and 20:40 and antibiotics (Rocephin 1000mg IV) were

administered at 20:40.  (VA_1279).

Plaintiff was next seen by Linh Du, M.D., who evaluated Plaintiff for admission.

Dr. Du noted Plaintiff was an "obese male, not in respiratory distress," with "decreased

breath sounds" and "fine crackles."  (VA_1269-1270).  Dr. Du diagnosed Plaintiff with

community acquired pneumonia and ordered a plan, which included giving Plaintiff

rocephin and azithromycin, as well as oxygen and nebulizers.  (VA_1271).  Dr. Du also

noted that because  Price was immunosuppressed due to his rheumatoid arthritis

treatment, the inpatient team should "consider fungal infection and even [tuberculosis] if

---

[3] As the parties submitted thousands of pages of documents as exhibits, references to any documentary exhibits will be to their Bates numbers.

[Plaintiff's pneumonia] did not improve with rocephin and azithromycin." Id. The attending physician in charge of the inpatient team, Andrew S. Raxenberg, D.O.,acknowledged receipt of this note. (VA_1272).

The medical records from the evening of March 7, 2007 and early hours of March 8, 2007 indicate that Plaintiff was ambulating without difficulty or shortness of breath, that he denied pain, and that he had an oxygen saturation rate of 94% on room air (with a rate of 95% overnight). (VA_1264, 1265).

On March 8, 2007, Plaintiff was placed in respiratory isolation until tuberculosis could be ruled out and two tests for TB were ordered: an acid-fast bacillus smear ("AFB") and a tuberculin skin test ("PPD"). (VA_1241-1243). Plaintiff reported feeling better and said he was still coughing, but less than the day before. (VA_1241). On examination, his breath sounds were distant, but no wheezes or crackles were present. Id. He used the supplemental oxygen as needed, with an oxygen saturation rate of 93%. Id.; (Tr. 2, 98:4-99:12).

On March 9, 2007, Plaintiff generally had no complaints. (VA_1227). Plaintiff reported his cough had improved since the prior day, he was no longer short of breath, and that he wanted to be off supplemental oxygen. Id. On exam, his lungs were clear to auscultation bilaterally, with no wheezes, rales, or crackles. Id.

In the early morning of March 10, 2007, Plaintiff had an oxygen saturation rate in the low 90's on room air, and was using the oxygen as needed. (VA_1224.) At that time, Plaintiff had no complaints of any discomfort. Id. Later that same day, Plaintiff's breath sounds were clear and his respirations were regular on room air. (VA_1222).

Again, he reported no complaints.  VA_1223).  At another examination the same day,

Plaintiff's lungs were clear to auscultation bilaterally, with no wheezes, rales, or crackles

and he had no complaints. (VA_1218).  Plaintiff's oxygen saturation rate was 95%.  Id.

He remained in isolation pending the results of the TB testing. (VA_1220).  Later, in the

evening on March 10, 2007, it was reported that Plaintiff was "very pleasant and

cooperative" and that he had no complaints of pain or discomfort.  (VA_1216).

    The next day, on March 11, 2007, Plaintiff reported that he was feeling much

better as compared to when he first came to the hospital.  (VA_1215).  His lungs were

clear, he was pain free, and was in good sprits.  Id.  Later that evening, Plaintiff reported

that he did not feel 100% back to normal, but was much improved.  (VA_1212).  Upon

examination, Plaintiff's breathing was noted to be better and his lungs were clear to

auscultation bilaterally, with no crackles or wheezes.  Id.  Plaintiff had an oxygen

saturation rate of 95% on room air.  Id.  The plan was for him to complete a 10 day

course of antibiotics and to remain in isolation until the AFB culture came back negative.

(VA_1213).  Further, it was noted Plaintiff would likely be discharged the following day if

the AFB did come back negative.  Id.

    The following morning, March 12, 2007, Plaintiff was up and about in his room,

denied being in any pain, and had no complaints.  (VA_1202).  His breath sounds were

clear and his respiration was regular and unlabored on room air.  (VA_1203).  The blood

cultures came back negative and the three sputum samples tested for AFB were

negative.  (VA_1874-1876).  Accordingly, the doctors determined it was time for Plaintiff

to be discharged.  (VA_0449).  Plaintiff was discharged with instructions to continue

taking the antibiotic, Levaquin, once daily and to "report to the ER/a physician, if your cough returns, if you become feverish or have trouble breathing." Id. Plaintiff was also informed that he would need a follow up chest x-ray in six weeks to "make sure that [his] lung infection is resolving." (VA_0449).

Two days after his discharge, on March 14, 2007, Dr. Robinson called Plaintiff's home to see how he was feeling. (Tr. 1, 162:15-24). Plaintiff's wife spoke with the doctor and stated Plaintiff was feeling 75% better and that he was still weak, but much better than prior to being in the hospital. (VA_1188). Dr. Robinson asked Mrs. Price to have Plaintiff call the next week regarding his progress. (VA_1188; Tr. 1, 162:19-25, 163:1-25). On March 21, 2007, Dr. Robinson's nurse contacted Plaintiff regarding renewal of his methotrexate (which had been on hold) and Plaintiff indicated he was short of breath, felt bad, and was very weak. (Tr. 1, 164:10-17; VA_1189). He also said that he was experiencing a productive cough for the first time. Id. At Dr. Robinson's direction, the nurse directed Plaintiff to follow up with his primary care provider and instructed him to obtain a follow up chest x-ray, which was scheduled for the following day at Dr. Robinson's office. (Tr. 1, 165:1-21; VA_1189-90).

On March 22, 2007, Plaintiff saw Dr. Robinson and reported that he felt worse than when he was admitted to the hospital on March 7, 2007. (VA_1182). He complained of a non-productive cough, shortness of breath at rest, headache, and decreased appetite. Id. He also complained of being more short of breath than prior to his first admission, especially at night when trying to sleep. Id. Plaintiff also reported

that during the hospitalization, he was supposed to have an evaluation by a pulmonary specialist, but he was told they were shorthanded.[4] Id.

On physical exam, Dr. Robinson documented that Plaintiff's lungs were clear to auscultation bilaterally with crackles and decreased breath sounds bilaterally. (VA_1184).  A repeat chest x-ray revealed increased infiltrate bilaterally, as compared to the March 7, 2007 film.  (VA_1185).   Dr. Robinson was concerned about an atypical pneumonia versus methotrexate pneumonitis, and she directed Plaintiff to return to the Gainesville VA hospital for admission.  (VA_1186).  Dr. Robinson also noted that no pulmonary consult was conducted during Plaintiff's prior admission and she called the VA hospital to speak with a physician to provide details regarding Plaintiff's case and to express her belief that a pulmonary evaluation was needed.  Id.  Dr. Robinson testified she was concerned about atypical pneumonia at this point because Plaintiff had failed the treatment for community-acquired pneumonia and therefore, it was appropriate to look for another etiology.  (Tr. 1, 167-168; 184:23-25).

Plaintiff was readmitted to the Gainesville VA hospital on Thursday, March 22, 2007.  He was seen by the pulmonary team during the evening of March 23, 2007 and was scheduled for an elective bronchoscopy on Monday, March 26, 2007.  (VA_1133-1137).  On March 26, 2007, the pulmonary team performed a diagnostic fiberoptic

---

[4]  Plaintiff testified that a nurse came in with a rubber hose in order to collect a sputum sample.  Plaintiff refused to allow her to do so and stated he wanted a pulmonologist to do it "because he knows what he's doing." (Tr. 1, 206:16-23).  Plaintiff stated the nurse returned several hours later and told Plaintiff a pulmonologist was not available.  (Tr. 1, 207:1-2).

bronchoscopy.[5]  (VA_1105-1106).  During the bronchoscopy, Plaintiff underwent a

bronchoalveolar lavage ("BAL") and a transbronchial needle biopsy.  (VA_1105). The

transbroncial lung biopsies were sent for surgical pathology and microbiology; the BAL

was sent for cytopathology, microbiology, and cell count; and other washings obtained

during the procedure were sent to microbiology.  (VA_1106).

On March 30, 2007, the surgical pathology from the transbroncial lung biopsies

came back positive for fungal forms consistent with cryptococcus.  (VA_1062).  Plaintiff

was switched to a new medication, fluconazole, and discharged with a diagnosis of

cryptococcal pneumonia, and instructions for future care and follow up.  (VA_0445-448).

In October 2008, Plaintiff received a telephone call from the VA chief of medical

staff, Bradley Bender, M.D.  (Tr. 1, 212, VA_660).  Pursuant to VA regulations, Dr.

Bender was required to disclose to Plaintiff an adverse event.  In this case, Dr. Bender

noted that Plaintiff was misdiagnosed with bacterial pneumonia and after his symptoms

worsened, Plaintiff was readmitted and diagnosed with cryptococcal pneumonia.

(VA_660).  Dr. Bender apologized for missing the diagnosis on the first admission and

explained to Plaintiff that it was a difficult diagnosis.  Id.  Dr. Bender also informed

Plaintiff of his right to file a tort claim.  Id.

It is undisputed that the team treating Plaintiff at the VA hospital in Gainesville

during his initial admission from March 7 through March 12, 2007 did not perform any

tests to rule out a fungal lung infection, despite knowing that Plaintiff was at greater risk

---

[5] As explained in the informed consent form (VA_1111-1112), this procedure uses a flexible bronchoscope that is inserted through the nose or mouth into the trachea, and then advanced to examine the bronchial tubes from the inside.

for such an infection due to the immunosuppressant drugs he was taking.  Additionally, no pulmonary specialist was ever called to examine Plaintiff during his admission and a follow up chest x-ray was not performed prior to his discharge.

Dr. Raxenberg, the chief resident and Plaintiff's attending physician, explained the team's reasoning and decision-making.  He explained that when Plaintiff was admitted, he was diagnosed with community-acquired pneumonia and the plan was to treat him with the standard therapy for such pneumonia: Rocephin and Azithromycin. (Tr. 2, 95:1-4).  It was specifically noted Plaintiff was immunosuppressed due to his rheumatoid arthritis and therefore, the plan was that if he did not improve with the prescribed therapy, the doctors would consider other types of infections, such as tuberculosis and fungal infections.  (Tr. 2, 95:9-12, 18-22).  Dr. Raxenberg also explained that shortly after taking the antibiotics, Plaintiff indicated he was feeling better and stated he was still coughing, but that it was less than the day before. (Tr. 2, 96:14-19).  Dr. Raxenberg testified that this improvement led the team to believe the antibiotic treatment was effective and when a patient responds positively to a treatment, the doctors will continue that treatment.  (Tr. 2, 97:1-9).

Dr. Raxenberg noted that two days after his admission, Plaintiff stated his cough had improved and that he no longer had any shortness of breath such that he no longer wanted to be on oxygen.  (Tr. 99:16-22).  Additionally, the next day, on March 10, 2007, Plaintiff's lung sounds were clear.  (Tr. 2, 101:10-15).  On March 11, Plaintiff's breath sounds were once again clear and Plaintiff reported that while he did not feel one

hundred percent, he felt much improved.  (Tr. 2, 102:10-19).  The next day, on March

12, Plaintiff was ambulating around his room and had no complaints.  (Tr. 2, 103:5-11).

Accordingly, it was Dr. Raxenberg's opinion that Plaintiff demonstrated clinical

improvement over the course of his hospitalization.  (Tr. 2, 105:9-21).  Dr. Raxenberg

further testified that if the team had sensed Plaintiff was not responding to the treatment

or getting worse, other tests would have been done.  (Tr. 2, 105:22-25, 106:1-6).

Additionally, he stated the team did not order another chest x-ray prior to discharge

because it can take four to six weeks for a chest x-ray to reflect the improvement that a

patient reports.  (Tr. 2, 106:7-19).  Dr. Raxenberg also explained that the team did not

obtain a pulmonary consult because the only time a consultant is required is where

there is a procedure the team believes is required or a question answered and there

were none in Plaintiff's case.  (Tr. 2, 106:20-25, 107:1-5).  He further stated that if he

had thought a pulmonologist needed to be involved or consulted, he certainly would

have done so.  (Tr. 2, 107:6-11).

Additionally, Dr. Raxenberg explained that the team did not think a bronchoscopy

or any other tests were necessary because Plaintiff improved each day and there was

no reason to put him through an invasive procedure with its own potential complications,

when he was responding to the current therapy.  (Tr. 2, 107:12-25, 108:1-3).  Plaintiff

was treated with broad spectrum antibiotics and was monitored and when he responded

well, there was no reason to go down other paths and send off other labs.  (Tr. 2, 108:4-

25, 109:1-2).

Plaintiff presented the testimony of Jeff B. Hales, M.D., as an expert in the fields of internal medicine, pulmonary medicine, and critical care medicine.  (Tr. 1, 58:1-4).  Dr. Hales testified the standard of care required that in a case with a patient like Plaintiff, who had a severe case of pneumonia and was immunosuppressed, further tests should have been conducted.  (Tr. 1, pp. 64-71).  Specifically, Dr. Hales believed sputum samples should have been examined under a microscope and then cultured (Tr. 1, 65:7-13) and that blood and urine samples should have been collected to examine for antigens (Tr. 1, 65:14-17).  Dr. Hales stated that if an appropriate sputum sample could not be collected, the standard of care required a bronchoscopy to attempt to obtain material from the lower airways.  (Tr. 1, 69:3-7).  Further, Dr. Hales believed that in Plaintiff's case, the standard of care required a firm diagnosis and confirmation that he was improving, which would likely involve a consultation with a pulmonary specialist.[6]  (Tr. 1, 69:11-15).  Finally, Dr. Hales testified that the standard of care required a second chest x-ray during Plaintiff's hospital stay to ensure the pneumonia was not getting worse and to establish a new baseline for when he left the hospital.  (Tr. 1, 71:10-18).

On cross-examination, Dr. Hales agreed that in a normal host, i.e. a host who was not immunosuppressed, it would be reasonable to assume that improvement in the patient's breathing after being treated with antibiotics meant that the patient had community-acquired pneumonia.  (Tr. 1, 102:1-6).  However, he believed that because

---

[6] On cross-examination, Dr. Hales admitted that at the hospital where he currently practices as a consulting pulmonologist, he does not believe a pulmonary consultation is ordered in every case of an immunosuppressed patient with pneumonia.  (Tr. 1, 117:7-10).

of Plaintiff's immunosuppressed status, it was not reasonable in the instant case and further tests were required.  (Tr. 1, 102:6-9).

Defendant presented the testimony of Zab Mosenifar, M.D. as an expert in the fields of internal medicine, pulmonary medicine, and critical care medicine.  (Tr. 2, 9:10-12).  Dr. Mosenifar is Chief of Pulmonary and Critical Care Medicine at Cedar Sinai Medical Center, Executive Vice Chair of the Department of Medicine at Cedar Sinai, and a professor at the UCLA school of medicine.  (Tr. 2, 5:12-25).  He is presently board certified in pulmonary medicine and internal medicine.  (Tr. 2, 6:23-25).  Dr. Mosenifar testified he has had many opportunities to treat patients with cryptococcal pneumonia as Cedar Sinai has a very active transplant program and cryptococcus is an opportunistic infection with patients who have lung transplants.  (Tr. 2, 7:9-19).

Dr. Mosenifar testified that the standard of care did not require a bronchoscopy be performed during Plaintiff's first hospitalization.  (Tr. 2, 11:16-18).  He explained:

> A bronchoscopy, the party line teaching and standard of index has been that a bronchoscopy in a case of pneumonia is indicated if the pneumonia doesn't get better and the patient gets worse, gets readmitted, or the symptoms get worse.

(Tr. 2, 11:19-25).  Dr. Mosenifar further explained that the bronchoscopy is an expensive procedure as it requires an operating room and a specialist, a pulmonologist.  (Tr. 2, 14:9-12).  He explained that his hospital alone has easily 200 cases of pneumonia a month and if bronchoscopes were performed in each of these cases, it would result in millions of bronchoscopes being performed, which would be unreasonable.  (Tr. 2, 14:14-21).

Dr. Mosenifar also opined that examining a deep sputum sample for fungus was not required by the standard of care in part because sputum does not have a high yield and also because it is difficult to test.  Specifically, it requires the lab technician to stain for a particular organism.  (Tr. 2, 15:20-25, 16:1-13, 17:13-17).  In addition, Dr. Mosenifar testified the standard of care did not require a second chest x-ray before Plaintiff was discharged.  He explained that years ago, people were routinely given repeated x-rays.  However, that was before they were aware of the potential dangers of repeated x-rays.  (Tr. 2, 17:22-25, 18:1).  Now, the standard of care is to take an x-ray during admission and to treat.  If the patient's condition improves subjectively and objectively, then there is no need for a second x-ray prior to discharge.  (Tr. 2, 18:1-5).  If the patient does not improve, then a second x-ray would be necessary.  (Tr. 2, 18:6-7).

Dr. Mosenifar testified Plaintiff's condition objectively improved in that he did not run a fever.  (Tr. 2, 19:1-7).  Additionally, his white cell count was not elevated and the white cell count normally goes up in pneumonia cases.  (Tr. 2, 19:8-11).  Further, his sputum production did not change and there was no significant change or worsening of his shortness of breath and those are the signs doctors typically look for.  (Tr. 2, 20:11-15).  Dr. Mosenifar also testified that Plaintiff's condition also subjectively improved insofar as he indicated he felt better to his caregivers.  (Tr. 2, 19:12-13).

Dr. Mosenifar stated that the standard of care did not require a pulmonologist consultation during the first admission.  (Tr. 2, 21:7-11).  He elaborated that "if things are getting better, an internist should be able to manage pneumonia very, very

-13-

competently." (Tr. 2, 21:16-17). When asked if he would have been consulted in this case, would he have done a fungal serology, Dr. Mosenifar answered he would have. (Tr. 2, 22:13-16). He clarified that despite his statement that he would have done a serology, he would not peer review a doctor who did not do a serology in the treatment of pneumonia that later turned out the be a fungal pneumonia. (Tr. 2, 25:3-6). Additionally, he explained that as a pulmonologist, his standard of care is different than that of an internist or a hospitalist. (Tr. 2, 82:11-25, 83:1-7). Once he has been called in, the patient's condition is severe enough that the index of suspicion is such that he would order a serology. (Tr. 2, 831-4).

Defendant also presented the testimony of Douglas S. McFadden, M.D. as an expert in internal medicine. (Tr. 3, 13:11-13). Dr. McFadden testified the standard of care was met in the instant case. (Tr. 3, 13:17-24). He stated that one of the hospitals in which he works has a very active organ transplant practice and therefore, he routinely sees patients who are immunocompromised. (Tr. 3, 16:1-7). He explained that pneumonia is a very common diagnosis for people who are immunocompromised. (Tr. 3, 16:4-7). Dr. McFadden stated that the treatment for such individuals is "generally they are always brought into the hospital, always initiated on broad-spectrum antibiotics, and monitored clinically to see how their symptoms do with this." (Tr. 3, 16:8-10). He elaborated that in situations where the patient does not respond to the treatment, he/she will then be seen by a pulmonologist and undergo a bronchoscopy and biopsy. (Tr. 3, 16:19-24). As for whether the standard of care required Plaintiff to have a follow-up x-ray prior to his discharge, Dr. McFadden testified:

> Generally people that are admitted with pneumonia, they clinically will respond prior to radiographically. What that means is, you know, the person that you see in front of you that's sick, usually they get better before the x-ray gets better, and so much so as long as somebody is not worsening and, you know, and as long as their temperature is not high, they're not more short of breath, their lung sounds, you know, you don't hear decreased breath sounds and think that they may have developed what we call an effusion, or pleural fluid, around their lung. If those things aren't present, the benefit of doing a followup radiograph at that time is minimal.

(Tr. 3, 18:17-25, 19:1-3).

## III.  Conclusions of Law

The Court has jurisdiction over this lawsuit pursuant to the Federal Torts Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b) and 2671 et seq.  The FTCA presents a limited waiver of sovereign immunity of the United States with respect to "claims . . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant . . ."  28 U.S.C. § 1346(b)(1). Suits brought under the FTCA are governed by the "the law of the place where the act or omission occurred."  Id.  Accordingly, this medical malpractice action is governed by Florida law.

To prevail in a medical malpractice action in Florida, a plaintiff must identify the standard of care owed, produce evidence that the defendant breached the applicable standard of care, and demonstrate that the breach was the proximate cause of the alleged injury.  See Turner ex rel. Turner v. United States, 514 F.3d 1194, 1203 (11th

Cir. 2008) (citing <u>Gooding v. Univ. Hosp. Bldg., Inc.</u>, 445 So.2d 1015, 1018 (Fla.1984));

<u>see</u> <u>also</u> <u>Torres v. Sullivan</u>, 903 So.2d 1064, 1067 (Fla. 2nd DCA 2005).  The plaintiff

bears the burden of proving a breach of the "prevailing professional standard of care"

for a particular health care provider "by the greater weight of the evidence."  Fla. Stat.

§ 766.102(1).  "The prevailing professional standard of care for a given health care

provider shall be that level of care, skill, and treatment which, in light of all relevant

surrounding circumstances, is recognized as acceptable and appropriate by reasonably

prudent similar health care providers."  <u>Id.</u>  Generally, the standard of care in a medical

malpractice action is established through expert testimony.  <u>See</u> <u>Pate v. Threlkel</u>, 661

So.2d 278, 281 (Fla. 1995).

In this case, three experts testified as to the standard of care.  Plaintiff's expert,

Dr. Hales, is a physician in Virginia.  Dr. Hales testified he spends half of his time in an

office-based setting and the other half at a hospital, where he performs pulmonary

consultation and ICU management.  (Tr. 1, 52:13-25).  Dr. Hales opined that the

standard of care in Plaintiff's case, because he was immunocompromised and had a

severe case of pneumonia, required the doctors to perform further tests in order to

check for a fungal infection.  Specifically, Dr. Hales believed that: (1) sputum samples

should have been examined under a microscope and then cultured (Tr. 1, 65:7-13); (2)

blood and urine samples should have been collected to examine for antigens (Tr. 1,

65:14-17); (3) if an appropriate sputum sample could not be collected, a bronchoscopy

should have been performed to attempt to obtain material from the lower airways (Tr. 1,

69:3-7); (4) a consultation with a pulmonary specialist should have been ordered (Tr. 1,

69:11-15); and (5) a second chest x-ray during Plaintiff's hospital stay should have been conducted to ensure the pneumonia was not getting worse and to establish a new baseline for when he left the hospital (Tr. 1, 71:10-18).

Defendant presented two experts. First, Dr. Mosenifar, an expert in pulmonology, internal medicine, and critical care, is a physician in Los Angeles, California. He is the Chief of Pulmonary and Critical Care Medicine at Cedar Sinai Hospital and is a professor at UCLA. (Tr. 2, 5:9-16). He spends about thirty percent of his time practicing medicine as a pulmonologist, thirty percent is spent on research, and another thirty percent is spent on teaching and administration. (Tr. 2, 5:20-23). The second expert, Dr. McFadden, is an expert in internal medicine and is a full time hospitalist. (Tr. 3, 7:6-8). Both Drs. Mosenifar and McFadden testified that the team at the VA hospital did not breach the standard of care in their treatment of Plaintiff during the first hospital admission.

As noted above, the proper standard of care for physicians in Florida entails the "duty to 'use the ordinary skills, means, and methods that are recognized as necessary and which are customarily followed in the particular type of case according to the standard of those who are qualified by training and experience to perform similar services in the community or in a similar community.'" Sweet v. Sheehan, 932 So.2d 365, 368 (Fla. 2nd DCA 2006) (quoting Brooks v. Serrano, 209 So.2d 279, 280 (Fla. 4th DCA 1968)). This standard is also known as the "locality rule." Siegel v. Husak, 943 So.2d 209, 215 (Fla. 3rd DCA 2006) (noting that "Florida adheres to the locality rule for physicians"). As Dr. McFadden is the only expert who has actually practiced in the state

of Florida, it stands to reason that he would be the most qualified to opine on the standard of care in this case.

Even without consideration to locale and even though the Court found the testimony of all of the experts helpful in its understanding of the standard of care for treating and diagnosing pneumonia, the Court finds the testimony of Dr. McFadden most persuasive.  Unlike the other two doctors, Dr. McFadden is a full-time hospitalist in Florida.  He testified that Tampa General Hospital, one of the hospitals in which he works, is one of the leading transplant centers in the world.  (Tr. 3, 15:8-15).  As such, he is routinely faced with immunocompromised patients and as pneumonia is common in people who are immunocompromised, he has much experience treating immunocompromised patients suffering from pneumonia.  (Tr. 3, 16:1-7).  Both Drs. Mosenifar and Hales are pulmonologists.  While they are both certainly very familiar with pneumonia cases, neither indicated they had the same level of experience in the initial diagnosis and treatment of pneumonia as Dr. McFadden.  Indeed, Dr. Mosenifar specifically stated that he, as a pulmonologist, would have a different standard of care than an internist or attending doctor in a hospital dealing with a case of pneumonia because once the pulmonologist is called in, someone has already made the determination that the case is serious.  (Tr. 2, 82:14-25, 83:1).

Additionally, Dr. Hales testified that he spent one year, the fourth year of his residency, performing duties similar to those performed by the attending physician in this case, Dr. Raxenberg.  (Tr. 1, 53:9-25, 54:1-9).  However, Dr. Hales specified that while he was the chief resident, his primary role "was to coordinate the internal medicine

residents' schedules and activities while they rotated through the VA Hospital." (Tr. 1, 54:1-6).  After his residency, Dr. Hales spent three years in pulmonary critical care at Johns Hopkins Hospital.  (Tr. 1, 54:13-14).  He explained that pulmonary critical care entails taking care of patients with chronic lung conditions.  (Tr. 1, 54:18-22).  He testified that he now provides care for "airway disease patients with asthma[,] COPD, [and] emphysema."  (Tr. 1, 54:22-25).  Additionally, he provides consultative services for patients with severe pneumonia and he sees many critically ill patients as his role as an intensive care doctor.  (Tr. 1, 54:24-25, 55:1-2).  Further, Dr. Hales testified he is no longer board certified in internal medicine because his "primary focus in medicine right now is pulmonary critical care."  (Tr. 1, 55:7-11).

While Dr. Hales testified he acts as a hospitalist when one of his group's patients is admitted to the hospital and that on occasion, he will assess and admit patients like Plaintiff (Tr. 1, 55:20-25, 56:1-6), he did not provide any information regarding the amount of time he does so.  Further, on cross-examination, Dr. Hales admitted that his hospital work is performed primarily in his capacity as a pulmonologist.  (Tr. 1, 94:8-10).  Additionally, he provided no indication that he spent in the past or now spends time treating immunosuppressed patients with pneumonia at the initial stage, rather than as a consultant.  Of course, the same is true for Dr. Mosenifar.  The Court is certainly not implying that these two gentleman are not qualified to opine on pneumonia in immunosuppressed patients.  Rather, the Court concludes that the opinion of Dr. McFadden, a Florida doctor who spends all of his time in the hospital and routinely

treats immunocompromised patients, is the most qualified and the most persuasive on the issue of the relevant standard of care in this case.

As the Court credits Dr. McFadden's testimony on the standard of care, it finds that the relevant standard of care in this case simply required the doctors to treat Plaintiff's case as community acquired pneumonia and to observe Plaintiff's condition. If Plaintiff's condition appeared to stagnate or to deteriorate, the doctors were then required to consider other causes of the pneumonia and to perform additional tests/procedures. As Plaintiff's condition did not deteriorate and instead, appeared to improve, the doctors in this case were not required to perform any other tests or procedures.

To the extent Plaintiff argues he was not improving because his vital signs did not change from the day he was admitted, the Court is not persuaded. While it is true Plaintiff did not have a fever upon admission to the hospital, the fact remains that he reported having a fever the evening before he was admitted. That he never had a fever while admitted was an indication to the medical team that the antibiotics were working. Dr. Raxenberg testified that if Plaintiff had ever experienced a fever during the first admission, the team would have re-evaluated their treatment plan. (Tr. 2, 105:22-25, 106:1-6). Additionally, the undisputed evidence is that Plaintiff's breath sounds improved to the point where no crackles or rales were heard. Further, Plaintiff reported feeling better and stated that his shortness of breath had been resolved. Although Plaintiff claims he was feeling better simply because he was lying around all day, the only information the doctors had to go by was what they could observe themselves and

what Plaintiff reported to them.  All of their observations and Plaintiff's reports indicated

the pneumonia was responding to the antibiotics.  Indeed, Plaintiff's expert, Dr. Hales

admitted that Plaintiff was "clinically stable to improving" during the initial admission.

(Tr. 1, 101:7-9).

## IV.  The Court's Decision

Based upon these findings of fact and conclusions of law, the Court is convinced

the team of physicians at the VA Hospital in Gainesville did not breach the standard of

care in their treatment of Plaintiff during the first admission.  Therefore, the Court finds

in favor of Defendant and against Plaintiff on Plaintiff's claim of medical malpractice.

While the Court is very sympathetic to Plaintiff's condition, it cannot be swayed by

sympathy.  Instead, it must impartially determine the facts and apply the law.  The

undersigned has endeavored to do so and the impartial evaluation of the evidence

reveals Plaintiff has failed to prove by the preponderance of the evidence that

Defendant breached the standard of care.

The Clerk is directed to enter judgment in favor of Defendant and thereafter, to

close the file.

**DONE AND ORDERED** at Jacksonville, Florida this ___10th___ day of September,

2012.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record